***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Plaintiff was employed by defendant Weyerhaeuser Company at its facility in Plymouth, North Carolina.
2. Defendant Weyerhaeuser Company was self-insured during the time of plaintiff's employment with defendant.
3. Plaintiff's income 52 weeks prior to his diagnosis was $28,6940.00. It was further stipulated that plaintiff's date of diagnosis was 5 May 1997.
4. Defendant manufactures paper and paper products such as paper for crafts, paper bags, boxes and pulp for baby diapers. The approximate size of defendant's plant in Plymouth, North Carolina, is of a mile long. The entire facility is built on approximately 350 acres and encompasses about 20 different buildings. The newest building was built in the 1960's and the vast majority of the insulation used in the original construction of the buildings was asbestos containing. There are steam producing boilers used at the facility in Plymouth, North Carolina. In addition, there are hundreds of miles of steam pipes that were covered with asbestos insulation. The heat coming off the steam pipes is used, among other things, to dry the wet pulp paper.
5. The parties are subject to the North Carolina Workers' Compensation Act, defendant Weyerhaeuser Company employing the requisite number of employees to be bound under the provisions of said Act.
6. Defendant stipulates that all the procedures used in Weyerhaeuser's asbestos medical surveillance program at its facility in Plymouth, North Carolina, were consistent with those outlined as part of the North Carolina Dusty Trades Program which defendant contends is contained in N.C. Gen. Stat. §§ 97-60 through 61.7. Further, that these procedures were in place during plaintiff's employment at the Plymouth facility.
7. Defendant stipulates that the medical monitoring procedures used in its asbestos medical surveillance program in all Weyerhaeuser plants in the State of North Carolina were the same.
8. Defendant stipulates that the Weyerhaeuser facilities to which Mr. Joseph Wendlick referred in his deposition transcript which has been stipulated into evidence included the facilities in North Carolina.
In addition, the parties stipulated into evidence the following:
1. A packet of documents referenced in Paragraph number 6 of the pre-trial agreement.
2. A packet of medical records and reports.
3. Depositions of Dr. Fred Dula, Dr. Phillip Lucas, Dr. John W. Wu, Dr. George L. Grauel and Dr. Richard C. Bernstein, which were previously taken in the case.
An Amendment to Complaint in Civil Action No. MDL-875 which was submitted after the hearing.
The pre-trial agreement dated 28 February 2000 which was submitted by the parties is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was 74 years old at the time of the hearing before the Deputy Commissioner, began working for defendant on 1 April 1965, and left defendant's employ in February 1966. He had previously served in the military during World War II, had farmed for a number of years and had just stopped working for Stebbins Engineering where he had worked for the previous year. Defendant had a facility in Plymouth, North Carolina, which included a paper mill and a plywood mill. Plaintiff was assigned to work at the plywood mill as a machine operator. He operated a panel saw and would cut the plywood after it came out of the press.
2. Normally, the plywood was brought to plaintiff's work station by another employee operating a forklift. However, there were occasions when plaintiff ran out of wood and the forklift driver was unavailable, so plaintiff would drive the forklift to the press area and get a load of plywood which he would take to his work area. During the time of plaintiff's employment, there were occasions when his machine was down or the entire process had been shut down for some reason. On some of those occasions, plaintiff's supervisor would send him to other areas of the mill to work. Plaintiff would sometimes sweep around the press or the dryers in the plywood mill. At other times plaintiff would clean off pipes from the paper mill which the company wanted to salvage, and on a few occasions he cleaned up debris at the paper mill.
3. Both the plywood mill and the paper mill relied on steam for various processes so there were steam pipes running throughout the facility. During the eleven months of plaintiff's employment, the pipes were insulated with asbestos-containing material. One of these pipes ran above his work station and then to a press. There was also asbestos insulation inside the press itself. When a pipe would spring a leak, pipe fitters would replace or repair the affected section of pipe. Before the pipe could be repaired, however, the pipe fitters would tear off the insulation which was in the way, and after the repair had been completed, insulators would reinsulate the pipe. Insulation debris and dust created by the repair process would be swept up with the wood dust and at times would be blown with an air hose. Plaintiff testified that millwrights worked on asbestos insulation repair in his work area nearly every day during his employment. The danger of exposure to asbestos dust was not understood well at the time, so no precautions were taken to confine the dust or to protect the employees in the work area. No respiratory protection was provided.
4. Plaintiff never worked as a pipe fitter or insulator. As long as his machine was operating, he did not work directly with the insulation and was exposed to the dust only to the extent that it was in the ambient air. However, the insulation was frequently disturbed in the building where he worked and the employees there were exposed to airborne asbestos dust from the repair work being done to the pipes and machinery, from natural decay and disintegration of the insulation, from forklifts accidentally knocking off pieces of insulation and from the employees sweeping in the area, which plaintiff did every day after his shift.
5. On the occasions when plaintiff had to clean pipes, he was exposed more directly to asbestos dust since he had to scrape off any insulation which was still stuck to the pipes. He used a grinder, sander and sometimes a wire brush to clean the pipes. He also had a more direct exposure the few times that he had to cut up pipes which were being discarded. The pipes were cut with a saw and torch so that they would fit in the dumpster.
6. Plaintiff complained of having dust all over his clothing by the end of his work shift. While he operated a saw which would have produced considerable wood dust, the dust from the insulation was also in the building and was a factor.
7. Sometime in February 1966 plaintiff left his employment with defendant to take a construction job with Davie McKee, but he worked only in that capacity for approximately six weeks before starting his own business, Barber Concrete and Erecting Service. Plaintiff's company poured and finished concrete and erected grain tanks. To plaintiff's knowledge, he was not exposed to asbestos dust in either of his last two employments. He did not describe any exposure to asbestos dust prior to his employment with defendant in his testimony. Consequently, his only known exposure was the almost eleven-month period he worked for defendant.
8. In March 1997, plaintiff underwent chest x-rays and a CT scan. His films were reviewed by Dr. Fred Dula, Dr. Richard Bernstein and Dr. George Grauel, all certified B-readers. Dr. Dula opined that the findings were "consistent with asbestosis." Dr. Bernstein reported that "increased interstitial markings are seen that with the proper exposure history and latency is consistent with asbestosis. Asbestos related pleural plaques are also present." Dr. Grauel found "within the mid and lower lung ones is a fine to medium irregular opacity pattern. The opacities may be associated with an underlying pneumoconiosis."
9. On 5 May 1997, plaintiff was examined by Dr. Dennis Darcey, an occupational disease specialist at Duke Medical Center. For some unexplained reason, Dr. Darcey recorded a very different history from plaintiff than his testimony at the hearing. Dr. Darcey's notes reflect that plaintiff worked at Texas Gulf in the late 1960's, that he worked for one year as a millwright installing equipment used to produce fertilizer, that he worked alongside insulators who were insulating pipes and boilers with asbestos insulation and that he occasionally cleaned off the equipment where the insulators were working so that clouds of dust were created. Dr. Darcey's notes also state that plaintiff worked for Stebbins Engineering for two years building stock tanks at Weyerhaeuser in an area with flaking insulation. Consequently, Dr. Darcey assumed that plaintiff had a three-year exposure to asbestos dust.
10. Plaintiff explained the job history discrepancies at the hearing before the Deputy Commissioner. He testified that the Texas Gulf employment referred to by Dr. Darcey was in fact his employment with Davie McKee which did not involve exposure to asbestos. Dr. Darcey's description of the work plaintiff supposedly performed for Texas Gulf was a description of plaintiff's employment in defendant's plywood plant. Plaintiff admitted his employment with Stebbins Engineering in accordance with Dr. Darcey's notes, but again believed that Dr. Darcey got the duties of the job with Stebbins mixed up with his employment with defendant. Plaintiff maintains that his employment with Stebbins, building stock tanks, took place outside of defendant's mills and did not involve exposure to asbestos.
11. Dr. Darcey ordered a pulmonary function test which was performed on 5 May 1997 and produced results consistent with moderate restrictive disease warranting plaintiff's classification of a Class 3 Impairment Rating in accordance with AMA Guidelines. Dr. Darcey's review of the ILO chest x-ray B read report showed "interstitial and pleural changes consistent with asbestosis." He further opined that "there was also pleural plaque, bilaterally." Based upon the history of exposure, Dr. Dula's interpretation of the chest films and the pulmonary function test results, Dr. Darcey diagnosed plaintiff with asbestos-related pleural disease and asbestosis, and noted that plaintiff "is also at an increased risk for developing lung cancer and mesothelioma as a result of his asbestos exposure."
12. Plaintiff underwent repeated testing in October 1999 and his films were read by Dr. Dula, Dr. Bernstein, Dr. Grauel, Dr. Wu and Dr. Lucas. The findings were consistent with those from the earlier films with little or no evidence of progression.
13. On 5 June 2000, plaintiff was evaluated by Dr. Albert Curseen, a pulmonologist. Dr. Curseen noted that plaintiff described a daily heavy exposure to asbestos dust in the late 1960's when he worked with kegs of asbestos powder which he said he poured into a vat, exposing himself to large clouds of dust from asbestos insulation which were reported to be so thick that he could not see his co-workers in the room. Based upon the history of a severe exposure and the findings of Dr. Dula, Dr. Curseen diagnosed plaintiff with asbestosis.
14. Although plaintiff's description of his employment with defendant as it is recorded in Dr. Curseen's notes differs from the job duties described in plaintiff's testimony, plaintiff's exposure to asbestos fibers while in defendant's employ remains a constant fact, as does the existence of plaintiff's restrictive lung disease and asbestosis attributed to that exposure.
15. Plaintiff has asbestos related pleural lung disease and asbestosis. While there is some discrepancy regarding plaintiff's work history, the only evidence of exposure to asbestos occurred while plaintiff was employed with defendant, and that evidence is uncontradicted. Further, there are no contradictions regarding plaintiff's diagnoses, and no evidence that plaintiff's medical evaluations are unreliable.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Asbestosis is a compensable occupational disease. N.C. Gen. Stat. § 97-53(24).
2. Plaintiff has shown by the greater weight of the evidence that he suffers from the occupational diseases of asbestosis and asbestos related pleural disease, and that his exposure to asbestos while in defendant's employ is the cause of plaintiff's condition. N.C. Gen. Stat. § 97-52.
3. N.C. Gen. Stat. § 97-61.5 provides in pertinent part that following a first hearing determination by the Industrial Commission that a claimant has asbestosis, based upon either medical evidence or by agreement of the parties, the Commission "shall by order remove the employee from any occupation which exposes him to the hazards of asbestosis . . ." and that upon removal the employee shall be entitled to "weekly compensation equal to sixty-six and two-thirds percent of his average weekly wages . . . which compensation shall continue for a period of 104 weeks."
4. The North Carolina Supreme Court determined that a retiree who is no longer employed by the asbestos-exposing industry is not entitled to an order of removal and the subsequent award because he no longer faces the possibility of exposure. See Austin v. General Tire, 354 N.C. 344,553 S.E.2d 680 (2001). Accordingly, plaintiff is not eligible for compensation pursuant to N.C. Gen. Stat. § 97-61.5.
5. Plaintiff is entitled to benefits pursuant to N.C. Gen. Stat. §97-31(24) for loss of or permanent injury to an important organ, in this case his lungs. However, the latest functional capacity evaluation undergone by plaintiff occurred on 5 May 1997. At that time, plaintiff was classified with a Class 3 Impairment Rating according to AMA Guidelines. Without a more recent evaluation, plaintiff's entitlement to a monetary award based upon loss or permanent injury to his lungs would necessarily be limited to that evaluation. Given the progressive nature of plaintiff's occupational disease, this could provide an inequitable result for plaintiff. Therefore, the Commission should reserve the issue of plaintiff's award pursuant to N.C. Gen. Stat. § 97-31(24) until plaintiff has an opportunity to undergo additional testing.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay all medical expenses related to plaintiff compensable occupational disease, including past and future diagnostic testing and treatment when bills are submitted according to procedures established by the Commission.
2. The issue of the amount of plaintiff's award pursuant to N.C. Gen. Stat. § 97-31(24) is hereby reserved until plaintiff has an opportunity to undergo additional testing and those results are forwarded to the Commission.
3. Defendant shall pay the costs of this action.
This the ___ day of April, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER